FILED
RICHARD W. NAGEL
CLERK OF COURT

2015 FEB 20  AM 10: 32

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES, ex rel.** <br> **SCOTT E. HOCKENBERRY, M.D.,** <br> 2388 Commonwealth Park, North <br> Bexley, Ohio 43209 <br><br> Plaintiff-Relator, <br><br> -v- <br><br> **OHIOHEALTH CORPORATION** <br> c/o Statutory Agent <br> Earl J. Barnes, II <br> 180 E. Broad Street -34th Floor <br> Columbus, Ohio 43215 <br><br> And <br><br> **OHIOHEALTH PHYSICAN GROUP, Inc.** <br> c/o Statutory Agent <br> Earl J. Barnes, II <br> 180 E. Broad Street -34th Floor <br> Columbus, Ohio 43215 <br><br> Defendants. | CIVIL ACTION NO.: <br><br> **2:15CV0666** <br><br> JUDGE: Judge Smith <br><br> **MAGISTRATE JUDGE DEAVERS** <br><br> C O M P L A I N T <br><br> *False Claims Act Complaint* <br> *filed under seal* <br><br> **Jury Trial Demanded** |

## COMPLAINT

### (Jury Trial Demanded)

1. This is a *qui tam* action by Plaintiff-Relator Scott E. Hockenberry, M.D. ("Relator"), for himself and on behalf of the United States, to recover damages and civil penalties arising from Defendants' actions in violating the False Claims Act, 31 U.S.C. §3729 *et seq.*

2. As discussed below, since 2009, Defendant OhioHealth, on its own, and by and through OhioHealth Physician Group, Inc. ("OHPG"), and Defendants' physicians, officers, employees, agents and/or members has submitted a multitude of claims to Medicare for critical care services for patients receiving care and treatment at its central Ohio facilities, including but not limited to Grant Medical Center ("GMC"), Riverside Methodist Hospital ("RMH") and MedCentral Mansfield ("MCM"). The vast majority of the critical care charges submitted by Defendants and paid/reimbursed by Medicare were what has become known as fraudulent "Upcoding." This involves critical care services (requiring a minimum of 30 minutes of actual patient care) which were either charged for duplicate services already performed by other medical practitioners, and/or unnecessarily charged since the patient was either not in need of critical care services, or the OhioHealth/OHPG physician only spent a fraction of the time charged actually providing the requisite medical attention to the patient.

### JURISDICTION AND VENUE

3. This action arises under the False Claims Act, 31 U.S.C. § 3790 *et seq.*

4. Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732(a), 31 U.S.C. § 3730 (h), and 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

5. Venue is proper in this district under 31 U.S.C. § 3732(a). The Defendants can be found,

reside and transact business within the district, and the acts forming the basis of this action occurred within the district.

## PARTIES AND RELATED ENTITIES

6. Relator Scott E. Hockenberry, M.D. is a medical doctor licensed in, *inter alia*, the State of Ohio and specializes in Trauma and General Surgery. From 1994 through 2009 he was employed by and/or affiliated with GMC as a trauma and general surgeon. From 2002 to 2006 he was the Chair of the GMC's Section of Trauma Surgery, and from 2006 to 2013 he was the Chair of the Department of Surgery, and from 2011 to 2013 he was the Vice Chairman of the Department of Surgery and Vice Chairman of the Section of Trauma Surgery.

7. OhioHealth Corporation is a business entity registered with the Ohio Secretary of State with its principal place of business located in Columbus, Ohio. OhioHealth's registered statutory agent for receipt of service and summons is Earl J. Barnes, II. Ohio Health owns and operates a number of hospitals and health care facilities in central Ohio, including, but not limited to three hospitals in Columbus, Ohio; Grant Medical Center ("GMC"), Riverside Methodist Hospital ("RMH") and Doctors Hospital ("DH").

8. OhioHealth Physician Group, Inc. is a business entity registered with the Ohio Secretary of State with its principal place of business located in Columbus, Ohio. OHPG's registered statutory agent for receipt of service and summons is also Earl J. Barnes, II. OHPG is the employed medical group of OhioHealth who employs more than 500 physicians in a wide range of medical specialties to staff OhioHealth's medical care facilities, including the hospitals identified in the paragraph above.

## CRITICAL CARE SERVICES THROUGH OHIOHEALTH

9. Relator incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

10. The United States, through the Department of Health and Human Services ("HHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program") and the Supplementary Medical Insurance Program established by Part B ("Medicare Part B Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395 et seq. The Medicare Part A and Medicare Part B programs are federally financed health insurance systems for persons who are aged 65 and over and those who are disabled. HHS has delegated the administration of the Medicare Program to the Health Care Financing Administration ("HCFA"), a component of HHS. Another component of HHS, the Office of Inspector General ("OIG") is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare and Medicaid fraud and abuse authorities.

11. The Medicare Part A program covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries. In addition, the Part A program covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage.

12. Medicare pays for physician services rendered for critical care based on a fee schedule. In establishing the fee schedule, HCFA adopted a comprehensive system of coding for services established by the American Medical Association (AMA). The Current Procedural Terminology (CPT) codes describe thousands of services using a five digit code with a narrative explanation of the use of the code. In certain cases, HCFA has added codes to

4

describe services not covered by CPT codes. The complete system of coding for Medicare services is known as the HCFA Procedure Coding System (HCPCS). The HCPCS codes and narrative description for those services contained in both the HCPCS and CPT coding structures are identical.

13. Critical care is defined by Medicare as "the direct delivery by a physician(s) medical care for a critically ill or critically injured patient. A critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of immanent or life threatening deterioration in the patient's condition." (*Infra* 30.6.12 (A)). It does **not** include E/M for patients who previously received critical care services.

14. The codes relating to physician visits and consultations are known as Evaluation and Management ("E/M") Codes. Physicians' critical care services are designated by CPT code 99291 for the first 30 through 74 minutes of critical care given. According to the Medicare Claims Processing Manual, as further detailed by the CMS Manual System Pub 100-04 Medicare Claims Processing Transmittal 1548 July 9, 2008, the use of code 99291 is only used once per calendar date per patient by the same physician or physician group of the same specialty.

15. CPT Code 99292 is used to report additional block(s) of time, up to 30 minutes each, beyond the first 74 minutes of critical care service. It is important to note that according to the CMS, critical care of "*less than 30 minutes total duration on a given calendar date is not reported separately using the critical care codes. This service should be reported using another appropriate E/M code such as subsequent hospital care.*" (CMS Manual System Pub 100-04, 30.6.12 (F), emphasis unchanged)

5

16. Up until 2009, Relator was actively engaged in the provision of trauma and general surgery services at Defendants' GMC facility through his professional medical association Trauma Inc. This included providing medical care and treatment to patients in need of critical care services. Relator both provided the medical services directly to the patients, as well as by monitoring and instructing medical residents under GMC's medical education program. Relator also was directly involved in the administrative billing services where physicians charged and reported the time spent with patients and the appropriate CPT codes were assigned to the service for billing and payment. Relator not only engaged in the CPT billing practices for the patients that he treated, but also in his administrative capacity overseeing the medical services provided by Trauma Inc.

17. In 2009, OhioHealth decided to discontinue the relationship with Trauma Inc. and hire and retain its own physicians services association. OHPG was created in part for this purpose. Many of the physicians who were associated with Trauma Inc. were hired by OhioHealth through OHPG to continue to provide physician services to patients at OhioHealth facilities. Relator was retained by OhioHealth in an independent contractor capacity to continue to perform general surgical services as medical director for surgical nutrition at GMC through 2013.

## MEDICAL PRIVILEGE

18. Relator incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

19. Through the continued presence at GMC in providing direct patient care, Relator observed firsthand a dramatic and troubling change in the manner by which OhioHealth and OHPG charged for critical care services.

20. Before OhioHealth's discontinuation of the relationship with Trauma Inc., Relator was responsible for implementing and supervising the billing services for Trauma Inc.

21. Relator personally witnessed the fraudulent billing scheme set forth herein. Independent proof of OhioHealth's wrongdoing is demonstrated by the progress notes of patients' medical charts. Each patient is protected from disclosure of such information under the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") (29 USC § 1881 *et seq.*), and Ohio's Medical Privilege Statute (O.R.C. § 2317.02(B). Relator neither possesses the right nor ability to provide independent verification of specific patient names, dates of treatment, and content of treatment according to the above laws and thus cannot disclose patient names or other vital and privileged information.

22. Independent evidence of OhioHealth's fraudulent practices will be revealed either by internal audit of billing records, and/or a review of patient charts for any patient admitted to the I.C.U. (and/or requiring critical care) between March 1, 2009, and December 31, 2013. In order to verify the scheme by such documentation, GMC ICU patient progress notes (with the patient's private information redacted but identified anonymously as "Patient 1 – [DATE OF TREATMENT]" should be accessed for any weekend day during the summer months for any year from 2009 through 2013 (typically the busiest time for trauma centers). A review of the morning progress notes of each patient will demonstrate that after the entry of the resident's progress note, another entry of the attending physician will state something similar

7

to: "I saw and examined the patient with our multidisciplinary care team today. We performed a comprehensive review of the patient's current problems and body systems and reviewed the SICU daily checklist. I have reviewed, edited and agree with the resident's note as above. I spent 30 to 75 minutes today providing critical care services for this critically ill surgical patient. This time does not include time spent during procedures." On a regular, ongoing basis, Relator has read similar entries in patient charts during the course of his employment with OhioHealth.

23. While such a note as set forth above would seemingly, albeit superficially, justify a 99291 (or 99292) code for critical care services, if the physician only reviewed the resident's note and performed rounds spending 10 minutes with each of 14 patients, it is a violation of Medicare billing standards to charge for thirty minutes or more of critical care time. As well, when the physician enters such a code for each of the 14 patients, he or she is claiming to have spent at least seven (7) hours providing critical care services. From Relator's firsthand observation, this is simply not a true account of the actual time the physician spent providing critical care and treatment to the patients.

## FIRST CLAIM FOR RELIEF

24. Relator incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully rewritten herein and further states:

25. The medical evaluation and management of critical care patients at OhioHealth facilities in general and GMC in particular routinely begins with the morning resident rounds. Resident physicians are medical students in the last stages of their medical training and receive direct patient care experience through teaching hospital settings such as that at GMC.

26. Medicare pays OhioHealth separately for the services provided by residents. Pursuant to Medicare Claims Processing guidelines, the instruction and supervision by physicians, such as Realtor and Defendants, of residents is compensated by Medicare as part of the resident training reimbursement program and is not subject to separate attending physician charges unless independently warranted.

27. During the course of Relator's care and treatment of patients at OhioHealth, he was directly involved in the instruction and supervision of residents. With respect to critical care patients in either the Emergency Department, the Intensive Care Unit ("ICU"), or other departments where critical care is provided, Relator participated and observed the instruction and supervision of residents for critical care patients.

28. Residents during morning "rounds" would attend to each critical care patient by performing complete assessments of symptoms, conditions, treatments and interventions. Residents would document each patient visit in the individual patient's electronic hospital record. Supervising physicians (including Relator and Defendants) would either accompany residents (when in the early stages of residency), and/or review chart entries after the residents had completed each visit to verify the propriety of the care and treatment. It is forbidden by Medicare billing standards for reviewing physicians to charge separately just for the review of resident activities.

29. Following the review of the resident notes, in the event a supervising physician (including Relator and Defendants) determined that in the best interests of the patient additional medical services were warranted (i.e. the patient went into cardiac arrest), the physician would implement same. Under these circumstances, since new services were required, it was

permitted by Medicare billing standards for additional CPT codes to be entered resulting in supplemental billing and reimbursement for physician services. This would also be permissible for critical care services if the care and treatment were necessary, and the coding physician spent the requisite minimum thirty 30 minutes providing the care.

30. It is a violation of Medicare Billing practices, as well as a fraudulent practice for a treating physician to charge critical care time when providing medical services that involved a time interval of much less than thirty (30) minutes; when doing nothing more than reviewing the notes and activity of residents, and when critical care is not medically necessary.

31. In 2009 after OhioHealth discontinued Trauma Inc.'s services, on a daily basis Relator witnessed firsthand OhioHealth/OHPG physicians improperly entering the critical care CPT code (99291 or 99292) for (1) the simple review of resident's activities (notes); (2) when not spending the requisite amount of minimal time (thirty–30–minutes) with each patient; and (3) when critical care was not medically necessary.

32. Based upon Relator's contact with Defendants' physicians and staff (including employees of the billing department) from 2009 to the present (January, 2015), the above detailed improper "upcoding" of Medicare charges for critical care services is a daily, systemic procedure within OhioHealth at any if its health care facilities that provides critical care services including GMC.

33. The motivation for the false critical care billing scheme is for no other purpose than to increase profits. From Relator's firsthand knowledge, the amount of the charge for critical care services charged to Medicare is on an increased multiplying factor over what is allowable for charges for standard evaluation and management ("E/M"). In other words, by

charging Medicare for unnecessary critical care services, OhioHealth increases the income it derives from the medical care exponentially over standard or pre-paid resident services.

34. Using ventilator management as an example, standard E/M CPT codes for Ventilation assist and management (94002) under the current CMS reimbursement guidelines allows payment of between $94.57 and $113.55 depending on other factors (mostly facility related). For critical care, the reimbursement rate is between $277.81 to $332.44 for first hour charges. When a physician enters CPT code 99291 or 99292 for treatment that should be coded 94002, he or she has automatically tripled Defendants' revenue for that service to that particular patient.

35. Relator also knows from firsthand knowledge and experience that for emergency department trauma and surgical services, a standard profit margin from Medicare patients is approximately 1% of gross billings. Since 2009, Realtor has been advised by OHPG that OhioHealth's profit margin for the same services has been as much as 17%.

36. Based upon information from existing OhioHealth billing personnel, since 2009 and through to the present time, Medicare continues to be billed for OhioHealth services (including the above stated critical care scheme) and issue payment to OhioHealth without any internal review or audit by either OhioHealth or OHPG to correct the fraudulent critical care billing scheme

37. Routine audit and bill screening procedures are not capable of detecting Defendants' scheme because the chart entries purport to fulfil the need for the critical care charge. A provider's billing statements, such as Defendants', regularly are screened by a Fiscal Intermediary

(generally a private insurance company, which is contracted by the government to review claims) for an "initial determination." *See* 42 C.F.R. § 405.904(a)(2); 42 U.S.C. § 405(g).

38. In the case at hand, the review of critical care charges on a patient by patient basis would not normally raise a flag with any intermediary because the corresponding progress note would properly document the basis for the critical care charge. However, when placing an entry from one patient chart next to an entry from the same date and timeframe for a patient in the next ICU bed (indeed for all the patients on the ICU during the same time frame), the identical entry will appear for each patient. It is not expected that this would be part of the standard review performed by a Fiscal Intermediary. It also demonstrates how OhioHealth has escaped detection to date.

39. The course of conduct engaged in by OhioHealth, OHPG and its employees, agents and/or members with respect to the charging Medicare of critical care services when duplicative of resident physician services, when entirely unnecessary, and when the time spent by the charging OhioHealth/OHPG physician for critical care services was materially less than the time interval charged to Medicare is fraudulent as in violation of the False Claims Act 31 U.S.C. § 3729 *et seq.*

40. Defendants' fraudulent billing scheme, by and through their physicians, officers, employees, agents and/or members, constitutes an intentional misrepresentation of the medical services provided to Medicare patients, which is material, made falsely with knowledge of Defendants of the falsity, and with the purpose of having Medicare rely upon the falsity, of which Medicare did by paying the fraudulent billing statements.

41. Under 31 U.S.C. §§3729 *et seq.* Defendants have violated the Federal False Claims Act in that they:

   (1) have knowingly presented or caused to be presented numerous false claims for payment or approval, and continue to do so;

   (2) have knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims, with the specific intent to obtain false or fraudulent claims paid or approved by the Government, and continue to do so; and

   (3) have conspired to commit the above acts, and to defraud the government by getting false or fraudulent claims allowed or paid, and continue to do so.

## RELIEF REQUESTED

WHEREFORE, Relator, on behalf of himself and the United States, prays:

(a) that the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' misconduct, plus a civil penalty of between $5,500.00 and $11,000.00 for each violation of the False Claims Act;

(b) that Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the government intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the government does not intervene;

(c) that Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees; and

(d) that the Court order such other relief as is appropriate.

**A TRIAL BY JURY IS HEREBY REQUESTED.**

Respectfully submitted,

*/s/ John R. Liber, II*
**JOHN R. LIBER, II** (0058424)
Thrasher, Dinsmore & Dolan
1400 W. 6th Street, Suite 400
Cleveland, Ohio 44113
Phone: (216) 255-5431
Fax: (216) 255-5450
Email: jliber@tddlaw.com

*Counsel for Relator*

## DISCLOSURE STATEMENT

The undersigned hereby certifies that prior to filing suit, on February 17, 2015, on behalf of Relator, a disclosure of substantially all material evidence and information was served upon the Government pursuant to 31 U.S.C. §§3730 (e)(4)(B) and 3730(b)(2).

*/s/ John R. Liber, II*
**JOHN R. LIBER, II** (0058424)