# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**UNITED STATES ex rel.**
**SCOTT E. HOCKENBERRY, M.D.,**

      **Plaintiff-Relator,**

    **-v-**

**OHIOHEALTH CORPORATION,** *et al.***,**

      **Defendants.**

Case No.: 2:15-CV-666
JUDGE GEOREGE C. SMITH
Magistrate Judge Deavers

## OPINION AND ORDER

Plaintiff-Relator initiated this *qui tam* action against his former employers, Defendants OhioHealth Corporation ("Ohio Health") and OhioHealth Physician Group, Inc. ("OhioHealth Physicians"), alleging they violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. This matter is before the Court on Defendants' Motion to Dismiss Plaintiff-Relator's Complaint against them for failure to plead his claim with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, and in the alternative failure to state a claim under Rule 12(b)(6).  (Doc. 8). The Motion to Dismiss is fully briefed and ripe for review.  For the reasons that follow, Defendants' Motion to Dismiss is **GRANTED.**

      **I.**      **BACKGROUND**

Plaintiff Scott E. Hockenberry, M.D. is a medical doctor licensed in the State of Ohio and specializes in trauma and general surgery.  He was employed both as a general and trauma surgeon at Grant Medical Center, one of Ohio Health's facilities from 1994 through 2013.  He served as the Chair of Grant's trauma surgery from 2002 through 2006; the Chair of the Department of Surgery from 2006 through 2013; and the Vice Chairman of the Department of

Surgery and Vice Chairman of the Section of Trauma Surgery from 2011 through 2013. (Doc. 1, Compl. ¶6).

Defendant OhioHealth Corporation ("Ohio Health") is an entity that owns and operates a number of hospitals and health care facilities, with its principal place of business in Columbus, Ohio. Defendant OhioHealth Physician Group, Inc. ("OhioHealth Physicians") is a business that employs more than 500 physicians in a wide range of specialties to staff Ohio Health's medical care facilities. (Doc. 1, Compl. ¶¶ 7—8).

Prior to 2009, Dr. Hockenberry provided surgery services to Grant through his professional medical association, Trauma Inc. He both provided services and was directly involved in the billing in his administrative capacity with Trauma Inc. (Doc. 1, Compl. ¶ 16). In 2009, Ohio Health ended its relationship with Trauma Inc. and created OhioHealth Physicians to fill this role. Many of the physicians who were previously associated with Trauma Inc. were hired by OhioHealth Physicians. Dr. Hockenberry was retained as an independent contractor to provide surgical services. (Doc. 1, Compl. ¶ 17).

The United States, through the Department of Health and Human Services ("HHS") administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program"), Title XVIII, of the Social Security Act under 42 U.S.C. §§ 1395, *et seq*. (Doc. 1, Compl. ¶ 10). The Medicare Part A Program is a federally financed health insurance system for persons who are aged 65 and over and those who are disabled. (*Id.*). Medicare pays for physician services rendered for critical care based on a specific and detailed fee schedule. In establishing the fee schedule, there is a comprehensive system of coding for services established by the American Medical Association ("AMA") (Doc. 1, Compl. ¶ 12). The Current Procedural Terminology ("CPT") codes describe thousands of services using a five digit

code with a narrative explanation of the use of the code. (*Id.*). Critical care is defined by Medicare as "the direct delivery by a physician(s) medical care for a critically ill or critically injured patient. A critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of immanent or life threatening deterioration in the patient's condition." (Doc. 1, Compl. ¶ 13 (citing Sec. 30.6.12(A), Medicare Claims Processing Manual, as further detailed by the Center for Medicare Services ("CMS") Manual System Pub 100-04 Medicare Claims Processing Transmittal 1548, July 9, 2008)). It *does not* include evaluation and management for patients who previously received critical care services. (*Id.*). In other words, a patient admitted to the hospital for lifesaving treatment is properly billed for critical care time if the duration of the service meets the thirty minute interval, then once stabilized, additional critical care time cannot be billed since the ongoing care and treatment is considered evaluation and management. Only if the patient requires additional emergency treatment, such as going into cardiac arrest, can additional critical care time be charged.

The codes relating to physician visits and consultations are known as Evaluation and Management ("E/M") Codes. (Doc. 1, Compl. ¶ 14). Physicians' critical care services are designated by CPT code 99291 for the first 30 through 74 minutes of critical care given. (*Id.*). According to the Medicare Claims Processing Manual, the use of code 99291 is only to be used once per calendar date per patient by the same physician or physician group of the same specialty. (*Id.*). CPT Code 99292 is used to report additional block(s) of time, up to 30 minutes each, beyond the first 74 minutes of critical care service. (Doc. 1, Compl. ¶ 15).

Dr. Hockenberry alleges that he observed firsthand Defendants' employees falsely entering notations in patients' charges that constitute fraudulent upcoding. These entries claimed that physicians provided thirty minutes or more of critical care services, when in fact no such

3

service was provided.  Plaintiff asserts that he personally witnessed this fraudulent billing scheme and that independent proof of Defendants' wrongdoing is demonstrated by the progress notes in the patients' medical charts.  He asserts that because of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 29 U.S.C. § 1881, *et seq.*, and Ohio's Medical Privilege Statute, Ohio Revised Code § 2317.02(B), he cannot provide patient names, dates of treatment, and content of treatment.  (Doc. 1, Compl. ¶ 21).

Dr. Hockenberry provides an example of a fraudulent entry by the attending physician that will follow a resident's progress note:

> I saw and examined the patient with our multidisciplinary care team today.  We performed a comprehensive review of the patient's current problems and body systems and reviewed the SICU daily checklist.  I have reviewed, edited and agree with the resident's note as above.  I spent 30 to 75 minutes today providing critical care services for this critically ill surgical patient.  This time does not include time spent during procedures.

(Doc. 1, Compl. ¶ 22).  He asserts that he read similar entries in patient charts during the course of his employment with Ohio Health and it is not a true account of the actual time the physician spent providing critical care to the patient.  He summarizes:

> While such a note as set forth above would seemingly, albeit superficially, justify a 99291 (or 99292) code for critical care services, if the physician only reviewed the resident's note and performed rounds spending 10 minutes with each of 14 patients, it is a violation of Medicare billing standards to charge for thirty minutes or more of critical care time.  As well, when the physician enters such a code for each of the 14 patients, he or she is claiming to have spent at least seven (7) hours providing critical care services.

(Doc. 1, Compl. ¶ 23).

Dr. Hockenberry brings this claim on behalf of himself and the United States to recover damages and civil penalties as a result of Defendants' actions in violating the False Claims Act, 31 U.S.C. § 3729, *et seq*.  The United States declined to intervene.  (*See* Doc. 3).

4

## II. STANDARD OF REVIEW

Defendant has moved to dismiss Plaintiff-Relator's case against them pursuant to Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to plead with particularity and failure to state a claim upon which relief can be granted.

Under the Federal Rules, any pleading that states a claim for relief must contain a "short and plain statement of the claim" showing that the pleader is entitled to such relief. Fed. R. Civ. P. 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim will be considered "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A*shcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 12(b)(6) allows parties to challenge the sufficiency of a complaint under the foregoing standards. In considering whether a complaint fails to state a claim upon which relief can be granted, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th Cir. 2012) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663. Thus, while a court is to afford plaintiff every inference, the pleading must still contain facts sufficient to "provide a plausible basis for the claims in the complaint"; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *Flex Homes, Inc. v. Ritz-Craft Corp of Mich., Inc.*, 491 F. App'x 628, 632 (6th Cir. 2012); *see also Iqbal*, 556

U.S. at 679.

In addition, complaints alleging violations of the False Claims Act must comply with Rule 9(b)'s requirements that all claims of fraud must be stated with specificity regarding "the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the misrepresentations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on fraud, and the injury resulting from the fraud." *AAA Installers v. Sears Holding Corp.*, 764 F. Supp. 2d 931, 939 (S.D. Ohio 2011); *see also Power & Tel. Supply Co. v. Sun Trust Banks, Inc.*, 447 F.3d 923, 931 (6th Cir. 2006) (recognizing that plaintiffs asserting a fraud claim must "allege the time, place, and content of the alleged misrepresentations on which he or she justifiably relied, the fraudulent scheme, the fraudulent intent of the defendants, and the injury resulting from the fraud."). The threshold test is whether the complaint places the defendant on "sufficient notice of the misrepresentation," allowing the defendant to "answer, addressing in an informed way plaintiffs [sic] claim of fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (citing *Brewer v. Monsanto Corp.*, 644 F. Supp. 1267, 1273 (M.D. Tenn. 1986)). The reasoning is that "defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003); *see also United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007) (finding that without the heightened pleading standard in FCA cases, "[d]efendants would not have notice of the specific conduct with which they were charged, they would be exposed to fishing expeditions and strike suits, and they would not be protected from spurious charges of immoral and fraudulent behavior."

A complaint's failure to comply with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6). *United States ex rel. Howard v. Lockheed Martin Corp.*, 499 F. Supp. 2d 972, 976 (S.D. Ohio 2007) (Dlott, J).

### III. DISCUSSION

Defendants have moved to dismiss Plaintiff's Complaint for failure to satisfy the heightened pleading standard imposed by Rule 9(b) of the Federal Rules of Civil Procedure.

**A.  False Claim Act Background**

The objective of the False Claims Act ("FCA") "was to broadly protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made." *Rainwater v. United States*, 356 U.S. 590, 592 (1958). The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §3729(a)(1)(A) (2008). The FCA allows for civil actions to be brought by either the Attorney General of the United States or by private persons. 31 U.S.C. § 3730(a)-(b). A private person, known as a "relator," is entitled to "bring a *qui tam* civil action 'for the person and for the United States Government' against the alleged false claimant, 'in the name of the Government.'" *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 769 (2000).

The FCA sets forth a specific procedure that a relator must comply with when filing a *qui tam* action. The relator must file the complaint and "substantially all material evidence and information the person possesses" to support the fraud claim. 31 U.S.C. § 3730(b)(2). The relator must serve a copy of the complaint on the United States. *Id*. After investigating the claim, the United States "may elect to intervene and proceed with the action." *Id*. If the United

States declines to do so, the relator may nevertheless proceed with the action and prosecute the FCA claim. *Id*. at § 3730(c)(3).

### B.      False Claim Act Pleading Requirements

Defendants argue that Plaintiff-Relator has not plead his claims for violation of the FCA with particularity. To plead fraud under the FCA with particularity, "the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466-67 (6th Cir. 2011) (citing *Bledsoe*, 501 F.3d at 503). When there are many alleged false claims over a substantial period of time, however, the relator need not plead every specific instance of fraud. *Bledsoe*, 501 F.3d at 509. Instead, "where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme." *Id*. at 510. If the relator presents concrete examples of fraudulent acts representative of other fraudulent acts in the entire scheme, the defendant will be able to infer with reasonable accuracy the precise fraudulent acts at issue, thus striking the right balance between protecting defendants from a fishing expedition, and allowing relators to pursue far-reaching fraudulent schemes. *Id*. at 511.

Further, under Rule 9(b), Plaintiffs may plead fraud based "upon information and belief," but the complaint "must set forth a factual basis for such belief, and the allowance of this exception must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Sanderson v. HCA-The Healthcare Co*., 447 F.3d 873, 878 (6th Cir. 2006).

C.  **False Claim Act Analysis**

Plaintiff-Relator alleges three separate violations of the False Claims Act: (1) Section 3729(a)(1)(A), which prohibits persons from knowingly submitting a false or fraudulent claim for payment; (2) Section 3729(a)(2)(B), which prohibits persons from knowingly making a false record or statement material to a false or fraudulent claim; and (3) Section 3729(a)(1)(C), which prohibits persons from conspiring to violate the foregoing provisions. (*See* Doc. 1, Compl. ¶ 41). Defendants argue that the Complaint does not contain any specific allegations of wrongdoing. Defendants assert that "Hockenberry does not identify any of the alleged physicians who were involved in the scheme, does not identify the types of clinical services that were the subject of the alleged improper coding, does not identify specific dates when improper coding occurred, and does not identify particular patient records containing improper codes." (Doc. 8, Def.'s Mot. at 8). Plaintiff-Relator counters that he witness the allegations in the Complaint first hand and that he has plead with particularity the time, place and content of the fraud that he witnessed.

With respect to the time frame, Plaintiff asserts that paragraphs 31 and 32 of the Complaint state that he observed Defendants' fraud between 2009 and 2015. Plaintiff relies on *Lane v. Murfreesboro Dermatology Clinic*, No. 4:07-cv-4, 2010 U.S. Dist. LEXIS 46847 (E.D. Tenn. May 12, 2010), which held that the time frame, during plaintiff's employment between 2002 and 2006, was sufficient to satisfy the particularity requirement. Alleging that he witnessed upcoding on daily basis for over six years is very broad, however, based on the holding in *Lane*, the Court finds that the time frame has been sufficiently plead with particularity.

Next, regarding location or place, Plaintiff-Relator states that the upcoding occurred at every Ohio Health facility where critical care services are provided, but further specifies that he

observed Defendants' fraud firsthand at Grant Medical Center, and the Emergency Department and Intensive Care Unit in particular. Again, while the location is very general and broad, based on the holding in *Lane* that the "clinic" or "satellite clinics" was sufficient, the Court will accept this as plead with particularity. *See Lane*, *supra* at *16.

Finally, with respect to content, Plaintiff alleges that he has plead with particularity the parties in paragraphs 6—8 of the Complaint and the nature of the fraudulent practice: "[i]t is a violation of Medical Billing practices, as well as a fraudulent practice for a treating physician to charge critical care time when providing medical services that involved a time interval of much less than thirty (30) minutes; when doing nothing more than reviewing the notes and activity of residents, and when critical care is not medically necessary." (Doc. 1, Compl. ¶ 30). He further asserts that he has provided details of the fraud in paragraphs 21-23 of the Complaint. Those paragraphs specifically state:

> 21. Relator personally witnessed the fraudulent billing scheme set forth herein. Independent proof of OhioHealth's wrongdoing is demonstrated by the progress notes of patients' medical charts…
>
> 22. Independent evidence of OhioHealth's fraudulent practices will be revealed either by internal audit of billing records, and/or a review of patient charts for any patient admitted to the I.C.U. (and/or requiring critical care) between March 1, 2009, and December 31, 2013. In order to verify the scheme by such documentation, GMC ICU patient progress notes (with the patient's private information redacted but identified anonymously as "Patient 1 – [DATE OF TREATMENT]" should be accessed for any weekend day during the summer months …(typically the busiest time for trauma centers). A review of the morning progress notes of each patient will demonstrate that after the entry of the resident's progress note, another entry of the attending physician will state something similar to: [See Progress Note Excerpt on p. 6 above] *On a regular, ongoing basis, Relator has read similar entries in patient charts during the course of his employment with OhioHealth.* (Emphasis added).
>
> 23. While such a note as set forth above would seemingly, albeit superficially, justify a 99291 (or 99292) code for critical care services, *if* the physician only reviewed the resident's note and performed rounds spending 10 minutes with each of 14 patients, it is a violation of Medicare billing standards to charge for thirty

10

>    minutes or more of critical care time. As well, when the physician enters such a code for each of the 14 patients, he or she is claiming to have spent at least seven (7) hours providing critical care services. From Relator's firsthand observation, this is simply not a true account of the actual time the physician spent providing critical care and treatment to the patients.

(Doc. 1, Compl. ¶¶ 21—23) (emphasis added).

Defendants argue that Dr. Hockenberry has not identified any of the physicians who allegedly engaged in the fraudulent upcoding scheme and he has not provided an example of a specific incident in which the upcoding occurred, such as by a certain doctor, on a certain date and in a certain patient's chart. Further, Defendants note that Dr. Hockenberry used the word "if" when describing the fraudulent scheme and did not state that a particular physician or group of physicians actually engaged in this alleged conduct. (Doc. 1, Compl. ¶ 23).

Dr. Hockenberry responds that he is not required to identify the physicians involved, nor can he disclose patient names as that would violation the HIPAA. However, Defendants argue, and the Court agrees, that there are ways around that. In *United States v. Millenium Radiology, Inc.*, No. 11-cv-825, 2014 U.S. Dist. LEXIS 138549 (S.D. Ohio Sept. 30, 2014) (Barrett, J.), the Court found that the relator who identified nineteen patients by their initials who underwent surgery on certain dates between August and September 2010, in addition to other information, was sufficient to maintain an FCA claim. Dr. Hockenberry could have referred to the physicians and/or patients by their initials, or he could have requested the Court enter a HIPAA qualified protective order pursuant to 45 C.F.R. § 164.512(e)(1(v), which would have allowed him to file the information under seal.

Defendants reference numerous cases in which courts have found that the relator failed to satisfy the Rule 9(b) particularity requirement. *See, e.g., United States ex rel. Nunnally v. West Calcasieu Cameron Hosp.*, No. 08-cv-371, 2012 U.S. Dist. LEXIS 71393, *13—14 (W.D. La.

May 21, 2012) ("the relator does not identify any specific physicians, patients, services or claims involved in the alleged scheme. … Thus, an allegation that some unidentified physicians participated in this scheme over a twenty year period of time, without more, is insufficient to state a claim."); *United States ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F.Supp. 2d 805, 824 (E.D. Texas 2008) ("Foster provides no one factual detail or example to support this allegation. He does not name any OHP physician who issued such prescriptions, nor any patient who received them—much less show that the patient was connected to Medicaid."); *United States v. Ortho-McNeil Pharm., Inc.*, No. 03-C-8239, 2007 U.S. Dist. LEXIS 52666, *15 (N.D. Ill. July 20, 2007) ("Without concrete examples of false statements and false claims, it seems as if West has filed suit based upon his suspicion that Defendants engaged in unlawful conduct with the hope that discovery will unearth some specific FCA violation. . . . Rule 9(b) does not tolerate such suits."); *United States ex rel. Grandeau v. Cancer Treatment Ctrs. of Am.*, No. 99-C-8287, 2005 U.S. Dist. LEXIS 17724, *7 (N.D. Ill. Aug. 19, 2005) (granting defendants motion to dismiss for failure to satisfy Rule 9(b) because complaint "fails to name specifically any physician who made referrals prohibited by the Stark Act" and complaint "fails to provide any representative examples to illustrate the alleged unlawful activity.").

      Dr. Hockenberry's allegations in the case at bar are strikingly similar to those in the aforementioned cases. He has failed to identify any of the physicians involved in this fraudulent upcoding that he alleges occurred on a daily basis over a six-year span. Nor does he even attempt to provide patient names by initial or describe the patient by injury, etc. Dr. Hockenberry has not even provided a specific example of the fraudulent conduct alleged. He did provide a general summary of something one might see in patient files and suggested it might be fraudulent "***if*** the physician only reviewed the resident's note." (Doc. 1, Compl. ¶ 23) (emphasis

added). Further, Dr. Hockenberry's assertions that he cannot provide the specific information because of HIPAA violations or because the specific information is in the possession of Ohio Health, are not valid excuses for failing to plead his claims with particularity. Therefore, the Court finds that Plaintiff has failed to plead with particularity his FCA claims as required under Rule 9(b) of the Federal Rules of Civil Procedure.

Even under the relaxed pleading standard in *Bledsoe II* and *Chesbrough*, Dr. Hockenberry cannot meet the necessary pleading requirements. In *Bledsoe II*, the Sixth Circuit first addressed the relaxed standard, holding:

> We do not intend to foreclose the possibility of a court relaxing this rule in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator . . . . Because this case does not present such circumstances, we express no opinion as to the contours or existence of any such exception to the general rule that an allegation of an actual false claim is a necessary element of a FCA violation.

501 F.3d at 504, n. 12.

The Sixth Circuit addressed this issue further in *Chesbrough*, holding that the relator must plead "facts which support a strong inference that a claim was submitted." 655 F.3d at 471. The Sixth Circuit ultimately concluded that the relators in Chesbrough were not entitled to the relaxed pleading standard because they were not directly involved in the billing process and did not have personal knowledge of the submission of false claims. The Sixth Circuit summarized:

> The case law just discussed suggests that the requirement that relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted by Defendants … for payment. Such an inference may arise when the relator has "personal knowledge that the claims were submitted by Defendants … for payment." *Lane*, 2010 WL 1926131, at *5 …. Here, the Chesbroughs lack the personal knowledge of billing practices or contracts with the government that the relators had in cases like *Lane*. Their personal knowledge is limited to the allegedly fraudulent scheme.

13

655 F.3d at 471—72.

In the case at bar, Dr. Hockenberry has not plead any facts to suggest that he was in any way involved in Defendants' billing process, nor that he had personal knowledge of the submission of false Medicare claims by Defendants.  He merely concludes that based on the entries in the patient files, "Medicare continues to be billed for OhioHealth services."  (Doc. 1, Compl. ¶ 36).  In a recent Sixth Circuit decision, *United States ex rel. Eberhard v. Physicians Choice Laboratory Services, LLC*, the Court concluded that, "[u]nder our case law, 'Rule 9(B) does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted.'"  642 F. App'x 547, 551 (6th Cir. 2016) (quoting *Sanderson,* 447 F.3d at 877).  This is exactly what Dr. Hockenberry is attempting to do in this case.  Dr. Hockenberry's conclusory allegations, therefore, do not meet the heightened or relaxed pleading standard are hereby dismissed for failure to plead his claims with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

## IV.   CONCLUSION

Based on the aforementioned, the Court **GRANTS** Defendants' Motion to Dismiss.

The Clerk of this Court shall remove Document 8 from the Court's pending motions list and terminate this case.

**IT IS SO ORDERED.**

 */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**